SILVERMAN ET AL., D. B. A. LEGAL SECRETARIAL SERVICE,
APPELLANTS, *v.* DUDLEY, ADMR., APPELLEE.

[Cite as Silverman v. Dudley, 17 Ohio Misc. 113.]

(No. 219799—Decided August 25, 1967.)

Common Pleas Court of Franklin County.

*Messrs. Reddy, Gygli & Roecker,* for appellants.

*Mr. William B. Saxbe,* attorney general, *Mr. Charles V. Waterfield* and *Mr. C. Richard Gregg,* for appellee.

LEACH, J. By decision of February 21, 1964, the Administrator of the Bureau of Unemployment Compensation found that appellants, Lee and Edith Silverman, d. b. a. Legal Secretarial Service had at least three or more individuals in employment as of April 1, 1960, and thus had incurred liability for payment of contribution for the years 1960 and 1961.

Under the provisions of Section 4141.26, Revised Code, appeal was then taken to this court by notice of appeal filed herein March 21, 1964. Thereafter no brief was filed on behalf of appellants until after this case was first dismissed for want of prosecution and then reinstated with a change of counsel for appellants.

This appeal must stand or fall on the basis of a determination of whether the administrator was warranted in concluding from the evidence that stenographers who entered into written contracts with appellants by which they performed work for others who paid appellants a contract price therefor, with appellants in turn paying such stenographers for such work, were employees of the appellants within the purview of the Unemployment Compensation Law of Ohio.

Lee and Edith Silverman, the appellants, are or at least were at the time of the decision here appealed from partners doing business under the name Legal Secretarial Service, hereafter referred to as Service. Service began operations in February 1960, as a private employment agency. Many of its job placements were in law offices in Cleveland as legal secretaries or stenographers.

Persons seeking employment directly by a law office or other employer, through the placement efforts of Service, signed a written contract, Exhibit 2 herein, providing for payment of "60% of first month's earnings for permanent employment." This contract further provided in effect that if the employment should prove to be "tempo-

rary'' through no fault of the applicant settlement should be made on the basis of ''20% of gross earnings for temporary employment of 90 days duration or less,'' but requiring payment of the full fee ''should I voluntarily, and without just cause, leave a position secured by me through LEGAL SECRETARIAL SERVICE, or lose the position through my own fault.''

There appears to be no question that all persons who secured employment directly with an employer through such an agreement with Service would not be considered employees of Service but instead would be employees of the specific employer for whom they worked and by whom they would be paid. Such would be true regardless of whether the employment otherwise would be classified as ''permanent'' or ''temporary.'' In either event the legal obligation to pay the stenographer for her services would rest on her new employer and the obligation to pay Service for its procurement of such employment would rest on the stenographer. It would appear herein that no claim is made by the Bureau of Unemployment Compensation that any of such persons became employees of Service.

In addition to the agreement contained in Exhibit 2, Service had another written agreement, Exhibit 1, styled ''Temporary Work Service Agreement.'' Such agreement provided as follows:

''In consideration of the services rendered in procuring temporary work assignments for me by LEGAL SECRETARIAL SERVICE, as Legal Secretary, Stenographer, Typist or any General Office Work of whatever nature, I hereby agree as follows:

''1. To hold all information received from LEGAL SECRETARIAL SERVICE confidential and for my own use and benefit only; and to report back to them within 24 hours on any referrals;

''2. When a temporary or part-time position is offered to me, I agree to accept such position as a contracted agent of LEGAL SECRETARIAL SERVICE, and not as an employee of any prospective Client-Employer until 90 days of service

has been completed on any single referral; where steady employment is being contemplated it is understood that all parties will be released from any further obligation after a term of 90 days from commencement of the assignment.

"3. That I will be compensated only for the hours of work performed, as certified by the Client-Employer and mailed at the end of each work week to LEGAL SECRETARIAL SERVICE, at the rate of *$2.00* per hour to be paid by me by the said Service-Agency by Thursday following each week worked.

"4. That no deductions will be made by LEGAL SECRETARIAL SERVICE for tax purposes of any kind, this being my sole responsibility; unless otherwise specified herein;

"5. That all of the above conditions will apply to each separate position for which I am engaged, unless otherwise agreed to in writing.

"For the purposes of this Agreement, the terms 'Client-Employer' is defined to mean a person or business who engages the facilities of LEGAL SECRETARIAL SERVICE, the 'Service-Agency.'

"I fully understand and agree to the terms of this contract.

Signed    /S/ Jane Doe

Address ..................

ACCEPTED:     City ............ Zone ......

LEGAL SECRETARIAL    Phone ...................

SERVICE     Date ...................

By .....................

Date ...................''

The rate per hour was agreed to by the stenographer and Service at the time of the execution of the agreement. Such rate might vary slightly dependent upon circumstances as to individual stenographers. Thereafter Service would contract with individual offices to furnish temporary help. Payment was made by Service directly to such stenographer once per week but only after receipt from the

"client-employer" of a "Time Check" form, Exhibit 3, which also contained the following language:

"EMPLOYER: At the completion of the work assignment, please verify the hours of work performed and sign this certification that same has been satisfactory. In consideration of the furnishing of temporary help by the Service Agency, Employer agrees not to employ the above-named individual privately for at least 90 days following completion of the work assignment; however, where permanent employment is being considered, both Employer and Secretary will be released from all obligation hereunder after the initial 90-day work period."

Although neither Exhibit 1 nor Exhibit 3 contained any language specifically limiting Service in the amount of the charge it could obtain from a "client-employer" for such services, it appears that the parties, in effect, included within such agreement the 20% of gross earnings for temporary employment or 90 days or less, contained in Exhibit 2. Thus Service ultimately collected the sum it paid the stenographer plus an additional 20%.

Those stenographers who signed such "Temporary Work Service Agreements," and who thereafter were paid for such work by check from Service, were included by the Administrator as employees of Service within the purview of the Unemployment Compensation Law. Was he warranted in so doing? That is the key question involved in this appeal.

At the hearing before a Deputy Administrator on March 15, 1963, the then counsel for appellants appears to have predicated his claim that such stenographers were not employees of Service principally on the assertion that they were independent contractors. As noted in the decision of the Administrator under the Unemployment Compensation Law of Ohio the common-law master-servant rule is not the sole test of whether a person be an independent contractor. Under the provisions of subsection (B)(1)(c) of Section 4141.01, Revised Code. " 'Employment' means service performed for wages under any con-

tract of hire, written or oral, express or implied" and "Employment" includes:

"(c) Services performed by an individual for remuneration unless it is shown to the satisfaction of the administrator that such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact, that such service is outside the usual course of the business for which such service is performed, and that such individual is customarily engaged in an independently established trade, occupation, profession, or business."

It will be noted that subsection (B)(1)(c) contains three tests or conditions, *all* three of which must be met in order to be excluded from the "employment" category as independent contractors. We think it clear that the work in question does not qualify as "an independently established trade, occupation, profession, or business." The record does not support any conclusion that the service was "outside the usual course of the business for which such service was performed," regardless of whether reference is made to the "Temporary Work Service Agreement" business of Service or made to the business of the "client-employer."

Considerable emphasis is laid on the claim that Service exercised absolutely no "control or direction over the performance of such services," and the finding of the Administrator of some right of control by Service is claimed to be contrary to the evidence. Since, as noted before, the test set out in subsection (B)(1)(c) of Section 4141.01, Revised Code, is a three-fold test, it makes no difference on the question of whether such stenographers were independent contractors whether or not such control was exercised.

Then too we might note that even this test is not limited solely to the exercise of control but includes the *right* of control.

In this case it is clear that the stenographers doing work under the "Temporary Work Service Agreement"

could only be classified for unemployment compensation purposes as (1) independent contractors, or (2) employees of the "client-employer" or law office to which they were assigned, or (3) employees of Service itself. For the reasons heretofore stated it appears that they did not meet the three-fold requirement of classification as independent contractors under subsection (B)(1)(c) of Section 4141.01, Revised Code. Therefore they must fall in the category of "employees," either of the office to which assigned or of Service itself.

In much of their brief counsel for appellants seems to concede that under the requirements of subsection (B)(1)(c) of Section 4141.01, Revised Code, such stenographers would not be independent contractors. Principally on the basis of the exercise of daily control in assignment of kinds and amounts of work to be done, time of starting and stopping work, providing of tools of employment such as typewriter, desk, chairs, etc., it is asserted that the application of the "ABC test" to this case "would appear to make that client-employer and only that client-employer liable for B. U. C. contributions." In other words it is asserted by counsel for appellants that the relationship of employer and employee was created and thus existed between the stenographer and the office for which temporary work was being performed by her.

The difficulty with this assertion is that it ignores the fact that a *contractual* relationship existed beween such stenographers and Service; that another *contractual* relationship existed between Service and the "client-employers"; that the former contract specifically defined the status of such stenographers as being "a contract agent of LEGAL SECRETARIAL SERVICE, and not as an employee of any propspective Client-Employer" within such period of temporary service (less than 90 days on any single referral); that the latter contract specifically prohibited the "Employer" from employing "the above-named individual privately" within the same period of time. Thus it is now asserted on behalf of appellants that the very relationship between the stenographer and the "client-employ-

er'' specifically forbidden and negated by its contracts existed in spite of the written agreements of those persons with whom Service contracted to the contrary.

"Employment" is defined by Section 4141.01 (B), Revised Code, as meaning "service performed for wages under any contract of hire, written or oral, express or implied." Independently of the question of control as to the mode and manner of work, an employer-employee relationship connotes and requires a "contract of hire." Here no such "contract of hire" existed as between such stenographers and the "client-employers." The specific language of the contracts, Exhibits 1 and 3, negates even the implication of such a contract. In our opinion this specific language and its necessary legal intent cannot be ignored and such employees transferred from their status as employees of Service to employees of a "client-employer" by oral testimony by several such employees that they considered themselves employees of the "client-employer."

The claim is made herein that it would be ridiculous to say that Service would be or might be liable in tort for actions of such employees while doing work at the direction of others. As noted in our decision in *Kant Slip Federal Credit Union* v. *Dudley, Admr.*, 9 Ohio Misc. 123:

"Under the 'loaned servant' doctrine a general employer may loan or assign his employee to another to do work for and under the direction of the latter and, under certain factual situations arising thereunder, the latter, under the principle of respondeat superior, may become liable for the act of the employee. 35 Ohio Jurisprudence 2d 623. Under such a factual situation, however, the obligation of the general employer to pay the wages to such employee continues, and the general relationship of employer-employee between the general employer and the employee continues."

Here as in *Kant Slip* the daily direction and control was by others. Here, as there, this fact alone does not convert the legal entity exercising such direction and control automatically into the status of employer as to such loaned or hired-out employees.

In effect it is asserted herein that the only purpose of the language of the contracts referred to above was to enable Service to collect its Employment Agency Fee which it earned by bringing other parties together for their mutual benefit and that the "payment of a fee" by an employee to an employer is incompatible with any concept of an employer-employee relationship. The actual language employed goes far beyond accomplishing merely such purpose.

An Employment Agency Fee for bringing together a prospective employer and a prospective employee necessarily implies the right of the parties thereupon to enter into a contract of employment. Here such right is contracted away for a period of 90 days by the respective agreements.

In its arrangements under Exhibits 1 and 3, Service does not differ in legal principle from any other agency supplying personal service personnel, skilled, semi-skilled, or unskilled to others for limited periods of time at fixed or agreed hourly fees. By collecting for such service 20% more than it pays the operating personnel, Service thereby obtains its "mark-up" or its profit. Thus a fee is not paid by an employee to an employer but instead a charge is made by Service at a fixed percentage in excess of its own obligation of payment to the personnel it supplies to others for the performance of its contractual obligations to such others.

If a "client-employer" turns out to be financially insolvent or its obligation of payment to Service becomes uncollectible for other reasons, such would not relieve Service of its contractual obligation of payment to such employee. A "contract of hire" exists between Service and such employee by which such employe as "agent" of Service physically performs the contractual obligation of Service made with the "client-employer" to furnish "temporary help" to such "client-employer." Obviously the consent and specific assignment by Service is required before any stenographer can purport to act as agent for it or enter into any work under such agreement.

Such an arrangement goes far beyond mere reference for a fee of a prospective employee to a prospective employer. Here Service had the *right* to control in the sense of the existence of such right as being necessarily incidental to the right to withhold payment for any breach by the employee of their contractual obligation to Service and incidental to the right of Service to terminate such contract with any particular stenographer. While a "client-employer" would actually exercise the daily direction and control normally thought of as incidental to an "employer-employee" relationship, such exercise of control in legal effect, could only be done pursuant to a necessarily implied contractual delegation of the basic *right* of control incidental to the respective contractual obligations of the parties. A failure on the part of such a hired-out employee to adequately perform the necessary functions to which assigned would give rise not to any right on the part of the "client-employer" to "discharge" such employee, but only the right to terminate its *contract with Service* and in the event a breach of such contract were claimed to refuse any *payment to Service.* The only contract which such employee had was that with Service. Any decision to terminate such contract because of inadequate performance or not to make future assignments of a particular stenographer would be a decision which could only be made by Service. Any dispute as to payment to such stenographer for work allegedly performed would have to be determined by reference to the respective contractual obligations between Service and such stenographer.

While, as noted before, the arrangements under Exhibit 2 falls strictly within the scope of an Employment Agency, *i. e.*, the bringing together for a fee of a prospective employer and a prospective employee, the arrangements under Exhibits 1 and 3 constitute the obtaining by appellant of the contractual right to sell the personal services of stenographers on a temporary basis at a mark-up or profit to itself and the sale of such services to persons temporarily in need thereof. Under the facts herein the Administrator of the Bureau of Unemployment Com-

pensation was warranted in concluding that such persons were employees of the appellant within the purview of the Unemployment Compensation Law of Ohio, and his conclusion to such effect is supported by the evidence herein.

For the reasons stated herein, the decision of the Administrator of the Bureau of Unemployment Compensation herein appealed from is affirmed and this case dismissed at the costs of the appellant. Entry to such effect may be prepared accordingly, reserving exceptions.